1 | **MICHAEL PANCER**
California State Bar No. 43602
2 | 105 West "F" Street, Fourth Floor
San Diego, California 92101
3 | Telephone: (619) 236-1826
Fax: (619) 233-3221
4 | Email: mpancer @hotmail.com

5 | **DAVID R. CLARK**
California State Bar No. 081675
6 | 1520 Wood Duck Lane
Meadow Vista, CA 95722
7 | Telephone: (530) 878-8700
Fax: (530) 878-3609
8 | Email: drclarklaw@att.net

9 | Attorneys for Defendant
**JUNG KWAK**

10

11

12 | **UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

**(HON. WILLIAM McCURINE, JR.)**

13

14

15

16 | UNITED STATES OF AMERICA,     )     Case No. 09-CR-2646-JLS (WMC)
                               )
17 |              Plaintiff,      )     **MOTION FOR PRETRIAL**
                               )     **RELEASE**
18 |     vs.                      )
                               )
19 |                             )
   **JUNG KWAK,**                 )
20 |                             )
              Defendant.         )
21 | _____ )

22 | TO:   KAREN HEWITT, United States Attorney for the Southern District of California,
         and MITCH DEMBIN, Assistant United States Attorney
23 | 
                                  **I.**
24 | 
                          __Introduction.__
25 | 
26 |        The grand jury has returned a single count conspiracy indictment against

27 | Jung Kwak and two other individuals.  The charges revolve around an alleged effort by

28

Mr. Kwak, through his San Diego based business, to hack a computer code used by the DISH network to encrypt its pay-for-view satellite television programming, so as to potentially increase sales of his competing receivers.

Although this case does not involve any violent crime or illegal narcotics, and despite the fact that Mr. Kwak is a United States Citizen with a minimal criminal record, despite the fact that the charges carry a maximum penalty of five years, and despite Mr. Kwak's long-standing family, personal and business ties to the community, the government is requesting pretrial detention pursuant to 18 U.S.C. § 3142 based on an alleged risk of flight. The Court should deny this request and set reasonable conditions of release.

## II.

## The Bail Reform Act/18 U.S.C. § 3142

### A.    The Government Must Prove a Serious Risk of Flight

As the Court knows, pretrial release is controlled by the Bail Reform Act of 1984, codified in 18 U.S.C. § 3141, *et. seq.* Under this statute, the Court "shall order the pretrial release" on "personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court" "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). In such cases, the Court can set conditions of release including the requirement that the bond be

2

secured by signatures, cash or real property.

Pretrial detention is authorized only under the most extreme conditions.  Three important principles have long governed bail considerations, as recognized by the Ninth circuit:

"1. Federal law has traditionally provided that a person arrested for a non-capital offense shall be admitted to bail.

2. Only in rare cases should release be denied.

3. Doubts regarding the propriety of release are to be resolved in favor of defendants."

*United States v. Townsend*, 897 F.2d 989, 993-994 (9th Cir. 1990) (citations omitted). Bail may be denied only in cases  involving proof that a defendant poses a serious risk of flight or danger to the community. 18 U.S.C. § 3142(f).  Under subsection (f), the Court is required to hold a detention hearing upon the government's motion if the case involves certain charges such as a crime of violence, a drug trafficking crime for which the maximum sentence is at least ten years, any crime for which the maximum sentence is life or death, etc.  Under certain circumstances, the Court must apply a rebuttable presumption the defendant should be detained.  *See* § 3142(e)(2) and (3).

This case does not involve either an offense for which the government is automatically authorized to seek detention or an offense for which detention is presumed.

Thus, "there is a statutory presumption that [the defendant] should be released pending his trial." *United States v. Giordano*, 370 F. Supp. 2d 1256, 1261 (S.D. FL. 2005).

Because this case does not qualify for a detention hearing under 3142(f)(1), the **only possible grounds** for detention are found in Section 3142(f)(2), which requires the government to establish a "**serious risk** that such person will flee" or "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure or intimidate. . . a prospective witness or juror." (Emphasis added). See *Giordano* at 1262; accord *United States v. DeBeir*, 16 F. Supp. 2d 592, 594 (D. Md. 1998) ("[The Act] allows dangerousness to justify detention only for those individuals who fall within the carefully delineated categories set forth in § 3142(f)(1), rather than those who pose a risk of flight or risk of obstruction of justice under (f)(2)").

In this case, the government has not alleged a serious risk of obstruction of justice, and therefore any request for detention ***must*** be limited to proof of a ***serious*** risk of flight sufficient to establish that no condition or combination of conditions could be set to reasonably assure Mr. Kwak will appear at any future court hearings. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996) (proof must go to the "***ultimate issue***: that no combination of conditions – either those set out in the Bail Reform Act itself or any others that the magistrate or judge might find useful – can 'reasonably' assure that the defendant will appear for trial") (emphasis added). *As* the Court of Appeals for the Ninth Circuit emphasized almost twenty-five years ago, "the procedures under section 3142 of

4

the Act must be **_strictly followed_** as a precondition to detention." *United States v.*

*Al-Azzawy*, 768 F.2d 1141, 1145 (9th Cir. 1985) (emphasis added).

### B.      The Factors the Court Must Consider

Once it hears the evidence from both sides, the Court must consider four factors in

determining whether to order an individual jailed without bail pending trial:

"(1) the nature and circumstances of the offense charged, including whether

the offense is a federal crime of terrorism; (2) the weight of the evidence

against the person; (3) the history and characteristics of the person,

including the person's character, physical and mental condition, family and

community ties, employment, financial resources, past criminal conduct,

and history relating to drug or alcohol abuse; and (4) the nature and

seriousness of the danger to any person or the community that would be

posed by the defendant's release."

*United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).

The 3142 factors weigh heavily in favor of setting conditions of pretrial release.

### i.       The Nature and Circumstances of the Charges Support Bail

The charge here is an alleged conspiracy to hack the Dish network computer code

to increase sales of satellite television boxes, hardly the type of charge that cries out for

detention. There are no violence, drugs, or terrorism charges. The conspiracy charge

carries a five year maximum penalty, a very modest maximum sentence by federal

standards, as many criminal statutes carry maximum sentences of 10 years 20 years, or life.  Mr. Kwak would not risk the loss of bond resources posted for him, nor the risk of significantly compounding his problems by running from this charge.

The charges do not relate to terrorism or other violent crimes, nor to drug trafficking, nor are there any allegations of witness tampering, evidence tampering, obstruction of justice, or efforts to flee.

### ii.      The Weight of the Evidence

Of course, the weight of the evidence is "the least important of these various factors, however, and the statute neither requires nor permits a pretrial determination that the person is guilty." *United States v. Cardenas*, 784 F.2d 937, 939 (9th Cir. 1986); *c.f. Stack v. Boyle, 342 U.S. 1, 5, 96 L. Ed. 3, 72 S. Ct. 1 (1951)* ("Unless the right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.")  Mr. Kwak merely emphasizes that he intends to mount a vigorous defense.  Further evincing his willingness to stay and confront this problem directly, Mr. Kwak and his family have pooled resources to hire three attorneys to defend himself against the allegations.

### iii.     Mr. Kwak's History and Characteristics Reflect his Ample Ties to the Community

Mr. Kwak is a 32 year old United States Citizen.  Although born in South Korea, he was brought to this country when he was just a little boy and has lived here ever since.

6

His father passed away when he was a small child, his mother and sister live in the United States; he does not know his family in Korea and only speaks rudimentary Korean.

He has no significant criminal record.  He has no history of violence.  He has no history of drug abuse.  He has no history of alcohol abuse or mental illness.  Mr. Kwak owns a residence and a substantial business in San Diego and has numerous friends and family living here.   Unlike many defendants in this district, Mr. Kwak has no ties to Mexico, which poses a significant temptation for flight to those who speak the language, share the culture, and have family and other support networks right across the border.

Mr. Kwak has strong ties to the community, as attested to in the numerous support letters (attached), having lived and worked in the San Diego region nearly all of his entire adult life.  Several individuals took the time to write personal letters to the Court in the last couple of days, and the overwhelming theme is that Mr. Kwak is genuinely friendly and a generous individual who is extremely loyal to his family.   As highlighted in the letters, these individuals view Mr. Kwak as:

–   "the type of friend you can only hope to have in your circle of friends," "always very encouraging and insisted that God had a better plan for me;" "I feel like I owe Jung a great deal for helping me change my life around" [Ethan Morris];

–   a "devoted friend" who "touches the lives of others and is always there with a helping hand in a time of need" [Gina Kang];

7

– "a strong role model" and someone who "makes you want to help others"
[Charlie Kim];

– a "kind and generous" person with "a loving heart" who "has always been by

side" and "I could trust him with my life" [Hana Kim];

– "dependable, responsible, honest and courteous" [Gent Paparisto];

– "in high school he worked part time to help support his family . . . while playing

on the high school football team and maintaining good grades;" since his father's

death, "Jung has taken responsibility for his mother and sister's welfare;" he is

"the best nephew anyone could hope to have" [Danial Pierce]

– a "hard-working man," "very respected by the local businesses;" in the "eight

plus years that we have known and befriended Junk Kwak he has shown us

nothing but loyalty, honesty, integrity and an oversized kind heart" [Tom Ratowski

and Derek Mascia];

– "I gave him a chance in an entry level job [in 1998].  He rewarded my

confidence in him by exceeding objectives and moving into a more senior position

within a short amount of time."  "I am so impressed with the love he has for his

family," "he works hard so his mom does not have to work" [Robert Rhine];

– "a big man with a big heart," "extremely generous and caring for his family,

friends and anyone that he meets" [Tom Robic];

Given this support, Mr. Kwak's history and characteristics weight strongly in favor

8

of setting bond.

### iv.  Danger Posed to Other Individuals by Release is non-existent

Mr. Kwak does not expect the government to present any evidence of danger to other individuals as a risk of his release.  That is because he does not pose a danger or threat to any witness or any other individual in the community, and thus this last factor weighs in favor of setting bond.

Finally, as a practical matter, the Court should consider this business-related case involves multiple defendants and is likely to involve voluminous discovery.  Given the large amount of discovery to review as well as the investigation the defense must pursue, and in consideration of the volume of criminal cases clogging the courtrooms in this district, it is unlikely this case will make it to trial for many months.  The expected length of the proceedings is relevant to bail.  *See United States v. Clymer*, 25 F.3d 824, 828 n. 3 (9th Cir. 1994) ("It is simply intolerable for a defendant - who may ultimately be found innocent - to be forced to spend almost a year and a half in jail before he has any opportunity to present his case").

### III.

### The Court Should Set Conditions of Release

Respectfully, Mr. Kwak suggests this case is not even a close call for bail. Mr. Kwak's circumstances are an even more compelling case than that confronted by the Ninth Circuit in its seminal bail case, *United States v. Motamedi*, 767 F.2d 1403 (9th Cir.

9

1985).  In *Motamedi*, the court reversed the district court's order of detention despite

charges of conspiracy and *exportation of arms*.  As a later case summed the up the facts,

the Circuit noted Mr. Motamedi, an Iranian citizen,

> had been living in the Los Angeles area, where he was indicted, for
>
> nine years; that he had applied for citizenship; that he had approximately
>
> 85 relatives in the Los Angeles area, including his wife, parents and
>
> brothers; that he offered evidence disputing the government's allegation
>
> that he could return to Iran; that his parents had posted their residence in
>
> Los Angeles as security on a $ 750,000 bond; that he had no prior criminal
>
> record and no history of alcohol or drug abuse; and that he had known of
>
> the government's investigation since January 1984 and had nonetheless not
>
> fled the country.

*United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990).  Despite evidence that

Motamedi was purchasing arms for the Iranian government and continued to do so after

being warned by U.S. Customs and the F.B.I., the appellate court ordered bail set.  *Id.*

Here, by contrast, Mr. Kwak is a United States Citizen involved not in arms smuggling

but in a case alleging efforts to promote satellite receiver sales to Americans, and he has

longstanding ties to the community and tremendous community support.

We have been lead to believe the government is going to proffer that Mr. Kwak has

secreted hundreds of millions of dollars in accounts in Korea and has grossed 750 million

dollars from his satellite receiver sales. We proffer that this information is incorrect

and hold the government to it's obligation to provide proof at the time of the hearing.

Mr. Kwak has no bank accounts in Korea .We believe the government may have been

confused by funds that were sent to Korea to purchase the satellite receivers.  Finally,

Mr. Kwak's two codefendants were arraigned and released on $1000.00 personal

surety bonds.

**IV.**

**Conclusion**

Mr. Kwak respectfully urges the Court to deny the government's request for

detention.   Undersigned counsel is working with proposed sureties and will propose

conditions of release that will reasonably assure Mr. Kwak's presence at all future

court hearings.

Dated:  July 15, 2009                       Respectfully submitted,

                                                         s/Michael Pancer

                                                         _____

                                                         MICHAEL PANCER

                                                         DAVID CLARK

                                                         Attorneys for Defendant
                                                         JUNG KWAK

11